JOHN W. PERRY *vs.* GEORGE F. BREED.

Suffolk. Nov. 10, 11, 1874. — Feb. 1, 1875. WELLS & DEVENS, JJ., absent.

After a bill of exceptions has been allowed and has been entered in this court, it is within the exclusive jurisdiction of this court, and cannot be altered by the judge of the court below, without the authority of this court.

If, on motion of either party, after entry of a bill of exceptions in this court and before argument thereon, there is reason to believe that there may have been a mistake or omission in drawing up the bill of exceptions, this court may postpone the argument on the exceptions, to allow an opportunity for a hearing before the judge of the court below, and that he may amend the exceptions if he sees fit.

If, after the entry of a bill of exceptions in this court, the judge of the court below amends the bill of exceptions, without authority from this court and without the assent of both parties, a party, who has not assented, is entitled to have the exceptions stand over for a hearing before the judge below, unless he elects to argue them as amended.

Where the plaintiff in an action of slander introduces evidence tending to show that the defendant repeated the same slander in another conversation than that in which the slander relied on was uttered, the defendant may prove the whole of that conversation.

Where one count of a declaration in slander, alleging special damages sustained by the plaintiff from words imputing an indictable offence, is abandoned by the plaintiff after he has put in his case, which contains evidence tending to support this count, it is within the discretion of the judge presiding at the trial to admit evidence offered by the defendant that the slander did not conduce to the damage alleged, and the admission of such evidence is not subject to exception.

On the trial of an action for slander imputing larceny and burglary of goods from the defendant's store, the plaintiff introduced evidence that the defendant, in the conversation in which the alleged slander was uttered, and in other conversations, had spoken of a policeman calling to see him about the robbery, and had stated that, in trying to ascertain the thieves, he had put his bookkeeper in a closet in the room in which he met the representative of the supposed thieves. In reply, the plaintiff offered the testimony of the defendant's partner, that in various conversations between them as to the robbery the defendant had never said anything to him about the policeman or the concealment of the bookkeeper, but this testimony was

not offered to prove that the defendant had made statements contradicting his testimony as a witness. *Held,* that the evidence was rightly rejected.

Where, in an action for slander, the answer alleges, among other defences, that " if the defendant said anything of or concerning the plaintiff, the same was true, and was without any malice on the part of the defendant," and the case is conducted upon the ground that one of the issues raised by the pleadings is the truth as a justification, no exception lies in favor of the plaintiff to a ruling by the judge, at the close of the evidence, that the jury should find for the defendant if the words uttered by him were true.

Tort for slander. The declaration contained two counts, the first of which alleged that the defendant publicly, falsely and maliciously accused the plaintiff of the crimes of larceny and burglary, and set forth the words spoken. The second count alleged that the plaintiff was a police officer of the city of Boston, and at the time of the slander had applied to the police commissioners to be appointed one of the constables of the Commonwealth ; that the defendant, contriving and intending to injure the plaintiff and to prevent him from obtaining the said appointment of constable, accused the plaintiff of burglary, whereby the plaintiff suffered great injury in his character and occupation as a police officer, and was prevented from obtaining the said appointment of constable. The answer contained a general denial, and also alleged " that, if the defendant said anything of or concerning the plaintiff, the same was true, and was said without any malice on the part of the defendant, and was a privileged communication."

Trial in the Superior Court, before *Putnam,* J., who allowed a bill of exceptions, the material parts of which were in substance as follows :

The plaintiff, in opening, read the second count in his declaration, but in his remarks to the jury made no allusion to the matters alleged therein. No evidence was offered by the plaintiff in support of the second count, unless the court is of the opinion that any of the plaintiff's evidence herein reported is evidence under that count. The plaintiff called John Newell as a witness, who testified as follows : " I had been trying to get the plaintiff appointed as one of the constables, and had some intimation from Mr. Bates that he would be appointed. Presently I heard that he would not be, and I saw Bates, and Bates told me he should not appoint him. Then I went to see the defendant. When he

came in I told·him my name, and said I had come down to know what he knew about the plaintiff; that I was a personal friend of the plaintiff, and wanted to know what he knew derogatory to his character. The plaintiff did not know, before I went there, that I was going,· and never asked me to go. I had been to the chief of police before, and I intended by this examination wholly to satisfy myself whether I had recommended a rascal or not. I told the defendant I wanted to know what he knew derogatory to the plaintiff's character, and the defendant went on and related the circumstances of breaking open his store in Pearl Street some years ago, and he said there were some number of hundreds dollars' worth of goods taken out of the store that night, but they didn't make much ado about it, or didn't go into the press, or make any noise in any way about it, but in a few days Perry came in and said that he knew, or that he knew a man that knew, where the goods were, and for one hundred and seventy-five dollars the goods would be forthcoming ; and he made some arrangement with Perry to have the man there, and then went down to the police station, and the captain told him there was evidently collusion, if that was the case, between the officers and thieves, and if possible to ferret it out; and he made an arrangement, when the man came down, to have their bookkeeper in the closet, and commenced a conversation with him, but he said he was very shrewd, and turned round and saw the door a little ajar, and got up and opened the door, and that let the cat out of the bag, or words to that amount ; that everything was at an end. And he went on to say that he believed Perry knew all about it, that he was in collusion with the thief, that he was a thief, and that he could have brought the other man forward if he had been a mind to ; that he looked upon Perry as a thief and liar, and that he had had his eye upon him ever since, and followed him sharp, and that Perry was the man. He also said, '·If I had known as much about the matter as I know now, he would probably have been serving a term in the state prison instead of being a candidate for any office.' I told him that I should tell Perry, as near as I could, this conversation, and he said he didn't care anything about that, he was able to back his statements ; and, furthermore, when I was going out, he added, there was one thing which made him more positive. Said he, ' He said (you will observe the lan·

guage) that he had never sent anybody down there, but if he had known this man was going to ask anything, he would not have sent him down there at all. I laughed at that contradiction.' Breed said that both Perry and the man he sent down asked one hundred and seventy-five dollars apiece, and that was more than the robbery — more than he valued the silk at. They were going to charge so much, he thought he might as well let one set of thieves have it as another. This interview and conversation between Breed and myself was in the early part of February, 1873."

On his examination in chief, Newell testified that the plaintiff did not know that he, Newell, was going to call on the defendant before he did go, and on cross-examination swore positively that the plaintiff did not ask him to go, and had no knowledge whatever of his intention to go before he went. On cross-examination, the witness testified that he had been somewhat active before the police commissioners, in trying to get Perry appointed as constable ; that he called on General Bates, the chairman of the commissioners, three or four times about it, once with Perry, to advocate his petition ; that, learning that the commissioners had determined to reject Perry, and, from Perry and others, that Breed had made statements about Perry to Bates, and some account of what those statements were, he went to see Bates, and then learned from him that Breed had said something derogatory to Perry, but not what it was Breed said. He also stated that when he called on Breed, and before Breed made his statement, he told him that he had recommended Perry for a place on the state constabulary, and had heard that he, Breed, had said things derogatory to his, Perry's, character, and he wanted to know what he, Breed, knew. He also added that he told Breed enough to show him that he had been active in getting his, Perry's appointment, and for that reason wanted to know what he had said derogatory to his character. He also stated to him that up to a certain time Bates had given him to understand that he thought very well of Perry, and witness had inferred that Perry would be appointed, and Bates afterward changed his mind, and gave him the inference that he was led to change his mind in consequence of a story that Breed had told him, and that thereupon he went to see Breed.

The plaintiff was called as a witness and testified, among other things, that he did not ask Newell to go and see the defendant, and had no knowledge whatever, before Newell went, that Newell intended to go or thought of going, and heard nothing about it until after Newell had been.

The plaintiff testified that he had heard from several parties that the defendant had told a story about him, and that he went to his store to see what it meant; and went on as follows, subject to the objection of the defendant: " I told Breed I had heard that he had said that I was a thief; that I broke into his store in Pearl Street, and that I went up there and told him that I would bring back the goods for one hundred and seventy-five dollars; and that I was the thief; and that he had followed me and was bound to break me if it cost him $1000; and that if he had known as much about me then as he did now, he would have me in state prison, where I belonged. I asked him if he said so, and he said he did. I asked him if there was n't some mistake; he said, ' After I went home last night, I was thinking it over, and I don't know but I have said a little too much. I did tell General Bates that you were the man who broke into my store, but I don't say so now.' I said, ' Will you go up and tell the General that ? ' and Breed said he would." On cross-examination, he testified that before this interview with Breed he had been an applicant for a place on the state constabulary, and that on the day after his application was rejected, and the day of this interview, Bates told him that Breed had told a story about him, and repeated it to him as he afterwards repeated it to Breed in the interview to which he testified. The conversation with Bates he gave as follows : " I said, ' I hear there is a story started about me since I saw you yesterday.' ' Yes,' said he, ' and a very bad one. That man you saw in my office yesterday says you broke into his store.' Bates told me that he did think very favorably of me till that story was told, but added, ' It won't do for me to recommend a man of that character.' He gave me Breed's name, and I went right down there, and there told him, word for word as near as possible, what had been said in Bates's office." The plaintiff also testified that he urged Bates to consider the matter further ; but that Bates had refused, saying that his mind was made up, and that Breed was a man who could n't be mis-

taken ; and that Bates told him the whole story as Breed had told it to him, substantially as the witness Newell gave it, and that he repeated it to Breed.  It appeared that this interview between Perry and Breed took place before the interview between Newell and Breed.

The plaintiff called other witnesses who testified to hearing statements made by the defendant similar to the statement testified to by Newell both before and after Newell had his interview with the defendant, among them one Washburn, who testified that he was present at an interview between the plaintiff's attorney and the defendant, at which the defendant repeated some of the statements that he said he had made to Bates, and in some respects corrected them.

The defendant called as a witness James D. Bates, chairman of the board of police commissioners, and this witness was asked to relate what took place at an interview between himself and the defendant at which the plaintiff was not present.  It appeared that this conversation took place about a week before the interview between Newell and the defendant which Newell testified to.  It was admitted, however, solely as affecting the question of the defendant's motive in stating what he did state to Newell, and as bearing on the defence, that what the defendant did say was a "privileged communication," and the judge, in charging the jury, confined it entirely to that question.  The counsel for the defendant, however, contended that it was admissible upon other grounds.  The counsel for the plaintiff then disclaimed any right to recover upon the second count of his declaration, and stated that he claimed no damages by reason of any failure to obtain an appointment as constable of the Commonwealth, and excepted to the admission of the evidence.

The conversation testified to by Bates under the plaintiff's objection and exception was as follows :  " I stood at my counter transacting business with Breed.  Perry came in and spoke to me something in relation to matters at police headquarters, and went out of the office.  Breed said to me, ' Who is that man ? What does he want ? '  I answered, ' His name is Perry, and his uniform tells you that he belongs to the city police.  He is an applicant for a position on the state police.  Do you know him ? '  Said he, ' I have something to say about that man.  Some years

ago my store in Pearl Street was robbed, and some time after this man came to my office and said to me, "You have had your store robbed." I said "Yes." He says, "I know something about the matter, and can put you in the way, I think, of getting your goods." He says, "I don't know so much about it as another fellow, but we should want out of it about one hundred and seventy-five dollars." ' Breed said that the man left, saying that he knew but little about it, the other man was the man who knew the most about it, and he would send him up there, and wanted him to talk with him ; that, subsequently, the other man came, and he concealed his bookkeeper in the closet, in order that he might hear the conversation ; but the man was too sharp for him, and opened the door and discovered the bookkeeper in the closet, and refused to talk as long as there was any one else about, but opened the conversation and told him that he knew where the goods were ; they were under a counter in some street. I don't remember the street ; they were under a counter in a store on some street in Boston. Those, he says, are the facts, and this man was the first man that came to me." He also testified that the plaintiff came to him the next day, and that he, at the plaintiff's request, repeated Breed's story to him, and gave him Breed's name.

The judge then, against the plaintiff's objection and exception, allowed the defendant to put in the testimony of Bates and of John W. Kimball, one of the police commissioners, to the effect that this statement did not, to their knowledge, defeat Perry's appointment.

This testimony was admitted by the judge, principally on the ground that from what the witness Newell had said both upon his direct and cross-examination, the jury might be left fairly to infer that Perry had lost his appointment by reason of what the defendant had said to Bates, and though counsel, by abandoning the second count, had disclaimed that as a special subject of damages, yet the jury might be prejudiced by it, unless it was explained or controlled. The judge distinctly charged the jury that they were not to regard it as a special matter of damages whether he lost his place or not for that reason.

The defendant testified himself, and was permitted by the presiding judge, against the plaintiff's objection and exception, to

state what took place and what was said according to his recollection, in the interview between himself and the witness Bates when the plaintiff was not present, to which Bates testified, and also testified that the statements made by him as testified to by Bates were true in fact. He also testified in reference to the interview between himself and the plaintiff, as to which the plaintiff testified, stating that the plaintiff opened the conversation by saying, "Did you tell General Bates a story about me?" and that the conversation which followed was different from the plaintiff's account of it. He also testified in reference to the interview with the witness Newell, stating that the latter began the conversation by saying, "Mr. Breed, Perry informs me that you have told a story to General Bates which will prevent his appointment on the state constabulary, and I have come to see you about it;" and that, upon being pressed by him, he repeated the story as he told it to Bates.

The defendant having, on cross-examination, identified Ira J. Patch, who was in court, as the bookkeeper whom the defendant testified he put into the closet at his store in Pearl Street, to listen to the conversation between the defendant and the man who came to see him, as the defendant alleged by the procurement of the plaintiff, in relation to the robbery, the plaintiff, in rebuttal, called Patch as a witness, who denied that he ever went into any closet to listen to any conversation, as testified to by the defendant, and denied that any such transaction ever took place.

The plaintiff, in rebuttal, called J. C. Batchelder, who was the defendant's partner at the time of the robbery in question, and for some years afterwards, and offered to show by him that he and the defendant had talked over the affair of the robbery at various times after it took place, while they were in partnership; and that the witness and defendant had often talked together on the question of who could have been concerned in the robbery, and that the defendant had expressed to the witness his suspicions in regard to the same, but had never said anything to the witness about any policeman's having called to see him, the defendant, in relation to the matter, or about any persons having called upon him, the defendant, in relation to it, and had never said anything to the witness about his having put the bookkeeper in the closet to listen to any conversation. The judge excluded this evidence as not in rebuttal, and the plaintiff excepted.

There was no evidence other than is herein stated tending to show whether the visit of the witness Newell to the defendant was made by the request or procurement of the plaintiff, or that the witness Newell, when he called on the defendant, had any duty to perform concerning the plaintiff or any interest in the plaintiff, or any interest of his own to protect or duty to discharge, or that the defendant had any interest of his own to protect or duty to discharge.

The defendant's counsel asked the judge to instruct the jury that if they found that the words uttered by the defendant to the witness Newell were true, they must find for the defendant. This instruction the plaintiff objected to, because it was not properly pleaded, but the judge gave it and the plaintiff excepted. The bill of exceptions also contained the charge of the judge upon the question of whether or not this was a privileged communication, and the applicability thereto of the evidence, to the admission of which the plaintiff had previously objected; but to this no exception was taken by the plaintiff, before the jury were sent out; and it is now omitted as immaterial.

The jury returned a verdict for the defendant, and the plaintiff alleged exceptions.

After the entry of the exceptions in this court, the judge who presided at the trial signed and transmitted to this court the following certificate:

" The witness Newell also testified that on his way home after leaving the defendant, he met the plaintiff with another officer on the street by the Revere House, and told him what the defendant had said, and afterwards told him to write it down. He said also that it was an accidental meeting.

" The defendant, on cross-examination, stated that the man who was sent down by the plaintiff to see him about the goods was George M. Felch. The plaintiff, in rebuttal, called Felch, who denied that he ever went to see the defendant.

" The question whether the statement which the defendant testified that he made to Bates and repeated to Newell, was true, was argued to the jury by both counsel.

" The counsel for the defendant, desiring that the foregoing may be added to and made part of the exceptions, and deeming the statements conformable to the truth, I hereby allow them."

*G. A. Somerby & L. S. Dabney*, for the plaintiff, objected that the judge had no right to add to or amend the exceptions after they had been once allowed. It appeared by the statements of counsel that upon the motion of the defendant, and, at the suggestion of the judge, a hearing was had before him, at which the defendant's counsel proposed the amendment in question, but it did not appear that the plaintiff's counsel assented that any addition should be made to the bill of exceptions as previously allowed.

GRAY, C. J. This seems to the court to be rather a question of form of proceeding and regularity of practice, than of substance. In strictness, after the bill of exceptions has been once allowed and has been entered in this court, this court has exclusive jurisdiction of it, and the judge below cannot alter it without the authority of this court. But it is the well settled practice, on motion of either party to the full court, before argument upon the bill of exceptions as allowed, when there is reason to believe that there may have been a mistake or omission in drawing up the bill of exceptions, and especially upon a certificate of the judge to that effect, to postpone the argument upon the exceptions, in order to afford opportunity for a hearing of both parties before the judge below on the proposed alteration, and to allow the exceptions to be amended in accordance with the result of that hearing as certified by him. *McCarren* v. *McNulty*, 7 Gray, 139. *Johnson* v. *Couillard*, 4 Allen, 446. *Culley* v. *Doe*, 3 P. & D. 539 ; *S. C.* 11 A. & E. 1008.

In the present case, the object of the judge in having another hearing, without waiting for a motion to this court, doubtless was to save trouble and delay to the parties. But as it does not appear that the plaintiff's counsel assented to such hearing or to any alteration of the exceptions as allowed, they are entitled, if they desire it, to have the case stand over for further hearing before the judge below.                    *Ordered accordingly.*

The plaintiff's counsel then elected to argue the exceptions as amended, according to the certificate already transmitted.

*M. Storey*, for the defendant.

MORTON, J. 1. The slander relied on was the statement made by the defendant to the witness Newell. But the plaintiff put in

evidence tending to show that the defendant had a conversation with the chairman of the police commissioners, in which he uttered the same slander. It was competent for the plaintiff to put in this or any other repetition of the slander charged, upon the question of malice. But having introduced evidence of this conversation, it was the right of the defendant to testify to, or to prove in any other mode, the whole of the same conversation. The testimony of the plaintiff and of Bates as to this conversation was therefore admissible.

2. The testimony of the police commissioners, that the statements made by the defendant did not induce them to refuse to appoint the plaintiff as one of the state constables, was competent under the pleadings. In the second count of his declaration the plaintiff alleges as special damage that by reason of the slander uttered by the defendant he was prevented from obtaining an appointment as one of the constables of the Commonwealth. After he had put in his case, he gave notice that he did not rely upon this count. But he had introduced evidence tending to support this count and to prove the special damage alleged. This evidence, if uncontrolled, would naturally affect the minds of the jury unfavorably to the defendant. The testimony offered by the defendant to rebut or control it was within the issue presented by the pleadings, and it was within the discretion of the presiding judge to admit it. *Bannister* v. *Alderman*, 111 Mass. 261.

3. The bill of exceptions does not show that the testimony of Batchelder was improperly rejected. It was undoubtedly competent for the plaintiff to contradict the defendant by proof of any declaration or act by him inconsistent with his testimony. But Batchelder was not offered to prove that the defendant had made any statements directly contradicting his testimony upon the stand. The offer was to show that he and the defendant had talked over the affair of the robbery at various times after it took place, while they were in partnership, and on the question who could have been concerned in the robbery, and that the defendant had never said anything to the witness about any policeman's having called to see him, or about his having put the bookkeeper in the closet. The admission of evidence of this character must be, to some extent, within the discretion of the court. If a witness has made a previous statement of the transaction in regard to which

he testifies, under such circumstances that he was called upon as a matter of duty or interest to state the whole truth as to the transaction, it might be competent to put such previous statement in evidence, to show that he then omitted material parts of the transaction to which he now testifies. The fact that he did not then state the omitted parts may afford some presumption that they did not happen, and thus tend to contradict his testimony. Of this character was the case of *Hayden* v. *Stone*, 112 Mass.          , in which a witness for the plaintiff having testified that a former owner of a piece of land had stated to him that he owned beyond the fence which was its apparent boundary, the presiding judge permitted the defendant to show that the witness was one of three appraisers of the estate of such owner, and when appraising this land did not state that the late owner claimed beyond the fence. It was his duty, as appraiser, to inform his associates of his knowledge as to the extent of the land to be appraised; and the fact that he did not inform them that the owner claimed beyond the fence, afforded some presumption that he was mistaken when he testified that the owner had so informed him. The exception to the admission of this testimony was therefore overruled.

But the admissibility of such evidence depends upon the question whether the previous statement was made under such circumstances that such presumption or inference fairly arises. In the case at bar, the plaintiff did not offer to put in the conversation with Batchelder, and the bill of exceptions does not disclose the circumstances under which they took place, and therefore does not show whether, from the fact that the defendant did not state to Batchelder certain parts of the transaction as he now relates it, any reasonable inference can be drawn that he is not now stating the truth. The bill of exceptions does not state a case which shows any error in excluding the testimony.

4. The exception to the ruling that the jury should find for the defendant if the words uttered by him were true cannot be sustained. The objection was that the truth was not pleaded as a justification. It was pleaded substantially, though not with technical precision. The evidence had been put in, and both parties had conducted the case, upon the ground that one of the issues raised by the pleadings was the truth as a justification, and the plaintiff took the objection, which is a purely technical one, too late.

We have considered all the exceptions taken at the trial. No exception was taken to the charge of the presiding judge at the trial, and none is now open. *Exceptions overruled.*