ALBERT E. HECTOR *vs.* BOSTON ELECTRIC LIGHT COMPANY.

Suffolk.   November 14, 15, 1893. — June 22, 1894.

Present: FIELD, C. J., ALLEN, HOLMES, MORTON, & BARKER, JJ.

*Amendment of Exceptions — Personal Injuries from Contact with Wire charged with Electricity — Licensee — Statute.*

The presiding judge is not required by law to allow amendments of the bill of exceptions by the excepting party, but his power so to do is undoubted, and although such amendments cannot be allowed without the consent of the excepting party, they may be allowed with his consent so far as is necessary to make them conformable to the truth and the whole truth with reference to the questions of law raised at the trial, and included in the original bill of exceptions.

It is within the power and discretion of the presiding judge to allow amendments to a bill of exceptions which are made after the time for filing the original bill has expired.

A lineman employed by a telephone company having, for the purpose of affixing wires of the company to a standard erected on the roof of a building by an electric lighting company, an implied license to reach the roof by going up through the building, who uses a different way, and, while unnecessarily upon the roof of an adjoining building, sustains injuries from contact with an uninsulated wire charged with electricity belonging to the electric lighting company, is not acting within the scope of his license, and is not entitled to recover.

The St. 1883, c. 221, extending the laws as to the erection and laying of telegraph and telephone lines, except Pub. Sts. c. 109, §§ 16, 18, to lines for the transmission of electricity for the purpose of lighting, relates solely to the authority to erect, lay, and maintain such lines, and to the regulation of such lines, and it does not relate to the liability of electric light companies for injuries received by any person from the posts, wires, or other apparatus of such companies.

TORT, for personal injuries occasioned to the plaintiff from contact with a wire through which an alternating electric current was being transmitted.

The first count of the declaration alleged that the defendant was a corporation engaged in the business of furnishing artificial light and power by means of electricity, and that for the pur-

pose of transmission and distribution of the same it maintained lines of wire attached for their support to standards, posts, or poles erected upon buildings , that on March 10, 1890, such a wire was strung by the defendant over a building numbered 41 on Temple Place in the city of Boston, through which alternating electrical currents were being transmitted; that the currents were of such force as to be dangerous to human life and health if the wire should come in contact with the human body; and that the defendant negligently permitted the wire to be suspended in such a position and at such a distance from the roof that the plaintiff, while in the discharge of his duty as a lineman of the New England Telegraph and Telephone Company upon the roof of the building No. 41 Temple Place, and while in the exercise of due care, was injured by contact with it.

The second and third counts were similar to the first, except that they alleged the accident to have occurred by reason of the defective insulation of the wire at the point where the plaintiff came in contact with it; and by the third count the plaintiff claimed damages for his injuries under the provisions of Pub. Sts. c. 109, § 12, and St. 1883, c. 221.  Answer, a general denial.

The defendant also demurred to the declaration, assigning as grounds therefor, in substance, that the declaration did not contain averments of fact sufficient to create a duty on the part of the defendant towards the plaintiff, or to impose upon it any statutory liability.

The Superior Court overruled the demurrer; and the defendant appealed to this court.

The case was then tried in the Superior Court, before *Dewey,* J., and the jury returned a verdict for the plaintiff.  The defendant alleged exceptions, the nature of which appears in the opinion.

*E. W. Burdett & C. A. Snow,* for the defendant.

*S. L. Whipple & W. M. Noble,* for the plaintiff.

FIELD, C. J.    The exceptions in this case as amended were allowed by the presiding justice of the Superior Court, if it was within his authority and discretion to allow them, otherwise they were disallowed.  The original draft of the exceptions was filed on February 20, 1892, within the time allowed.  In

April following the counsel of both parties were heard upon the allowance of the exceptions. The plaintiff's counsel then asked that they be disallowed, which the justice at that time declined to do, but he suggested that the counsel confer together, and that the plaintiff's counsel point out what changes they thought should be made. This was done, and the draft of the exceptions was altered, and some things added to it with the consent of the counsel of the defendant, who, however, did not admit that all such alterations and additions were necessary. The plaintiff's counsel did not waive their objections to the allowance of the amended draft, but contended that it was substantially a new bill of exceptions, made up and filed after the time prescribed by the statute for filing exceptions had passed. Copies of the exceptions have been furnished us, showing the difference between the bill as originally filed and the bill as amended.

The excepting party has a right, if he chooses, to stand upon his exceptions as originally filed, and to prove the truth of them if they are not allowed. The extent to which errors in such exceptions can be corrected on a petition to prove the exceptions was considered in *Morse* v. *Woodworth*, 155 Mass. 233. The extent to which the presiding justice can allow the excepting party to amend his bill of exceptions has not been determined. In such a case as this, where many questions of law were raised at the trial, one of which was that upon all the evidence the plaintiff could not recover, it is hardly possible that the original draft of the exceptions, without any change, would be entirely acceptable to either the presiding justice or to the other party. The other party under the statute has a right to be heard upon the allowance of the exceptions, and the practice has been to permit the excepting party, if he chooses, with the consent of the presiding justice, to amend his exceptions so as to state more accurately and completely the questions of law which were raised at the trial and included in the bill of exceptions as filed. It is true that the presiding justice is not required by law to allow any such amendments, but his power to allow amendments is undoubted. *Perry* v. *Breed*, 117 Mass. 155. They cannot be allowed without the consent of the excepting party, but with his consent they can be, certainly so far as is necessary

to make the exceptions conformable to the truth and the whole truth with reference to the questions of law raised at the trial and included in the original bill of exceptions.

We have no occasion to consider in this case whether a distinct exception taken at the trial and omitted from the bill as filed by accident or mistake can be added by an amendment to the original draft after the time has expired for filing exceptions. In the present bill we think that the amendments allowed by the presiding justice, with the consent of the defendant, were such as were within his power and discretion to allow.

The plaintiff was a lineman of the New England Telegraph and Telephone Company, and went upon the roof of the building No. 41 Temple Place, Boston, called the Youth's Companion building, for the purpose of affixing a telephone wire to a standard erected upon the roof of the building No. 45 Temple Place, which adjoined No. 41 on the side toward Washington Street. It was intended that this wire should run from West Street to this standard, and thence should swerve slightly toward Washington Street and pass across Temple Place. He was injured while on the roof of No. 41 by his left hand coming in contact with a wire belonging to the defendant, through which an alternating electric light current was being transmitted. This electric light wire ran over the southeasterly corner of the building on which he was, and at the point where the plaintiff's hand came in contact with it was about twenty-five feet from the corner. The wire formed one side of an alternating electric light circuit, the other wire of the circuit running parallel with it and at a distance of seventeen and a half inches from it. No wires of any kind were attached to the roof of No. 41 Temple Place, and the roof was clean, smooth, and unobstructed by anything except a scuttle near the back part of it, a skylight near where the plaintiff fell, and two or three other skylights near the rear of the roof. The roof of the building No. 45 Temple Place was about twenty feet below the roof of the building No. 41, and each was a flat, or nearly flat roof. Near the centre of the roof of No. 45, the defendant, which is a corporation engaged in the business of furnishing electric light and power in the city of Boston, had erected a standard about twenty-five feet

in height, on which were three cross arms running horizontally and at right angles with the line of Temple Place. This standard was used for the purpose of supporting various wires which were attached to it, and ran from it to two other fixtures on the other side of Temple Place. The highest cross arm was about five feet long, and had on it four glass insulators placed seventeen inches and one half apart, attached to which were four are electric light wires. The next lower cross arm was placed two feet below this, was about eight feet in length, and had upon it six insulators, placed at the same distance apart, to which were attached electric light wires. The two insulators next to the upright post, one on each side, had attached to them the two alternating electric light wires, and the remainder of the insulators had attached to them four arc electric light wires. The lowest cross arm was placed about one foot and one half below the middle cross arm, was about twelve feet in length, and had on it ten insulators placed twelve inches apart, to which were attached ten wires not electric light wires, of which at least six were telephone wires. All the wires attached to this standard ran northeasterly across Temple Place, above the southeast corner of the roof of No. 41, to two fixtures on the other side of Temple Place on the buildings No. 24 and 34. All the arc electric light wires ran to a standard on No. 24, and the two alternating electric wires on the middle cross arm, and the telephone and other wires on the lowest cross arm, ran to a standard on No. 34. The wires thus starting from the same standard on No. 45, as they crossed over the corner of the roof of No. 41, diverged and formed two distinct groups of wires, which for convenience are called the first and second groups, the wires running to No. 24 constituting the first group, and those running to No. 34 the second group. The point at which the second group of wires crossed the side of the roof of No. 41 next to No. 45 was distant from the southeast corner of the roof of No. 45 about fifteen feet, and the point where the first group crossed this side was distant from the same corner about twenty feet, so that there was a distance of about five feet between the two groups on the side of the roof of No. 41 next to No. 45. Between the place where these groups of wires crossed the side of the roof of No. 41 next to No. 45 and the rear of the roof of

No. 41 there was a distance of about seventy feet, and there was no obstruction of any kind on this part of the roof except two chimneys, each four feet in width, nor was there any wire, and any one might have gone on any portion of that part of the roof and looked down upon the roof of No. 45 without encountering any danger. The first group of wires, as they crossed above the corner of the roof of No. 41 were at distances varying from four to six feet above the roof ; the two alternating electric light wires, which were in the second group, were at a distance of about two feet and a half above the roof, and the telephone and other wires running from the lowest arm of the fixture on No. 45 were about one foot below the alternating electric light wires.

The plaintiff, at the time of the accident, was at work with others for the Telegraph and Telephone Company in stringing a telephone wire from the top of a building in West Street to the standard on No. 45 Temple Place, and thence to a fixture on the top of a building on the other side of Temple Place. He was told by the foreman to go upon the building No. 45 Temple Place and attach this wire to the standard there. He went up through the building No. 29 Temple Place, called the Warren building, and out upon the roof of that building, thence across the intervening roofs to the roof of No. 41. There were no steps or other means provided for getting from the roof of No. 41 to the roof of No. 45, and there was no ladder or rope on the roof which could be used for this purpose. There was access to the roof of No. 41 through the building No. 41, and also access to the roof of No. 45 through the building No. 45. The plaintiff, after getting upon the roof of No. 41, and after calling to a fellow workman in the street to come up on the roof of No. 45, went to look over the side of the roof of No. 41 to see how he could get down upon the roof of No. 45. He was looking over the side of the roof on to the roof of No. 45, and was stooping down — he had to stoop down to clear a large bunch of the wires — when he felt a current of electricity go through him, and he remembered nothing more. The plaintiff was found lying under the first group of wires, with four of his fingers burnt and a wound upon the side of his head where the hair was burnt off. The nearer of the two alternating electric light wires, as one approached them in going toward the side of the roof, had upon it

some pieces of burnt flesh, which showed where the plaintiff had touched the wire, and the insulation of the wire where it appeared that the plaintiff had touched it was worn off. The plaintiff had had a long experience with electrical apparatus, — was familiar with all kinds of electrical wires and the proper methods of handling them, and the dangers attendant upon the business. He testified "that he knew the general character of the structures used by the various companies in the prosecution of their business in Boston; that the Boston Electric Light Company has a structure of a peculiar color of its own, and that the fact last referred to was common knowledge among all linemen; that the Telephone Company had structures of a different color from that of the Boston Electric Light Company; that the colors of the structures used by the other companies in Boston also differed from the color of the structures of the Boston Electric Light Company; that linemen, if they were close enough to see the color of a structure, could easily tell whether it belonged to one company or another; that in the prosecution of his work as a lineman he had occasion in Boston to go on to roofs which were crossed by all sorts of wires, and to go upon structures which had all sorts of wires; that on the structure on 45 Temple Place he would not have been surprised to find there electric light, telephone, telegraph, police signal, and other wires; that telephone wires were sometimes insulated and sometimes not insulated."

It appeared that the alternating electric light wires did not resemble any wires used by other companies, except the police signal wires. The plaintiff testified in substance that he noticed the big bunch of wires, by which he must have meant the first group, but that he did not recollect noticing the others. All he remembered was that there was a big body of wires, and that he had to stoop in order to clear them, but he cleared them, and went to the edge of the roof and looked down; that he could not say whether there were any wires on his left or not; that he noticed that there were different kinds of wires on the roof after he got on to it; that the only safe rule to follow was to treat every wire as dangerous; that he was very careful not to touch any wire on a roof, because he was liable to get a shock; that even telegraph or telephone wires sometimes got across wires having

a dangerous current and became dangerous; and that the roof on which he was standing was a copper roof, which was a conductor, and made what is called a "ground." It was admitted that the defendant was transmitting through these alternating wires an electric current of one thousand volts, which was dangerous under certain conditions; but it was contended that, to make such a current dangerous, the person touching a wire must be "grounded," as it is called, that is, be connected with the earth by substances that are conductors of electricity, while the other wire of the circuit must be grounded at the same time.

The accident happened in the morning of March 10, 1890, when it was broad daylight. The jury found, in answer to a question submitted to them, that the plaintiff at the time of the injury was upon the roof of No. 41 Temple Place by the implied permission or license of a person having authority to grant such permission or license. The presiding justice ruled that the plaintiff could not under his declaration " claim that the defendant was unlawfully or without right maintaining the alternating wires in the position in which they were at the time of the accident, reserving, however, to the plaintiff the right to claim that the defendant negligently maintained said wires in such position." He also ruled " that there was no evidence of any invitation, express or implied," held out to the plaintiff by the owners of the building No. 41, and no evidence of any preparation or adaptation of the building by the owners for the plaintiff's use; and that, " if the plaintiff was a mere licensee, the defendant, if liable at all, was not liable for mere omission on its part to exercise reasonable care as to the position or condition of the wire which caused the plaintiff's injury, but would be liable only for acts of commission, and refused to rule that there was no evidence of any such act of commission." He also ruled " that a mere licensee going upon another man's land must take the premises as he finds them, subject to all their concomitant conditions and perils; and that, if the plaintiff was a mere licensee, in order to recover he must show some change or alteration in the condition of the premises or wire thereon whereby injury may arise to persons being upon the roof in question, that such change or alteration occurred during the existence of

the license in question, and that the plaintiff had no notice of such change or alteration." He also ruled that, if the plaintiff was on the roof of the building No. 41 as a trespasser, upon the evidence in this case he would not be entitled to recover. If the plaintiff was a licensee, he stated the law as follows: " The law is, that as between a licensee and the owner of the premises, where as against the owner of the premises he is a mere licensee, he has to take the premises in the condition in which he finds them. He occupies them as a licensee — pure licensee — at his own risk, unless, perhaps, in the case of some concealed trap. Now, the defendant claims that at most he was only a licensee, if he was that, and it claims that this same doctrine which applies as between the licensee and the owner of the premises applied between the plaintiff and it as the owner and maintainer of these electric wires, — that is what it claims. And so it says there was no duty from it to the plaintiff. Now the plaintiff claims something more. He claims there was more than that; that whatever might be his relation to the owners of the Youth's Companion building, yet that he was on that building by the permission of the owners, so that he was not a trespasser, was not there unlawfully, and that then, as between him and the defendant, a new element enters ; the plaintiff claims that the defendant placed the electric light wires on the building in Temple Place, where they were when the plaintiff was injured, and had full control of them at that time, that is, the defendant had full control of them at that time ; that through some of these wires thus placed there passed in their ordinary and daily use alternating currents of electricity, which, under such conditions as were liable to happen and might reasonably be expected to occur, became dangerous to human life and safety; that this was known, or reasonably ought to have been known, to the defendant and its servants, who put up and had charge of the wires; that there were also telegraph wires and telephone wires, with the defendant's knowledge and express or implied consent, attached to the same standard to which the wires of the defendant were attached, and at this place ran near the defendant's wires ; and that the defendant and its servants knew, or with the exercise of ordinary prudence and attention would have known, that the servants of the telegraph and tele-

phone companies, whose wires were attached as aforesaid, would, in the usual course of their duty and employment, have occasion to come to said standard and in close proximity with the defendant's said wires, and that the natural and probable consequence might be that unless the defendant used due and proper care in respect to its said wires, the said servants of the said telephone and telegraph companies, while in the usual course of their employment and duty as aforesaid, and though in the use of due care themselves, might be injured by said wires and the electric currents thereof. That is what the plaintiff claims. And what is the result? If the plaintiff satisfies you that these claims are well founded, and that the plaintiff at the time and place of his injury was a servant of the telephone company, was lawfully on said building, and then and there rightfully acting in the course of his employment, and where the defendant ought reasonably to have anticipated he might be, then the defendant owed him some duty in regard to its said wires." That duty the presiding justice afterwards defined as " the duty to use reasonable and ordinary care in respect to the condition of these wires and the location of them. . . . The defendant must use reasonable and proper care in the kind of wire it uses, in the care it takes of it while in use, and in regard to the location in which it maintains it."

Under this statement of the law, the claim of the plaintiff was in effect that the alternating electric light wires were not properly insulated ; that at the particular place where the plaintiff touched one of them the insulation had been carelessly allowed to be worn off; and that the wires were placed in a position so near to the roof that a person on the roof would naturally come in contact with them. The jury must have found that there was a license or permission given by the defendant to the Telegraph and Telephone Company to attach its wires to its standard on the building No. 45 Temple Place. The principal questions argued are, whether the defendant owed the Telegraph and Telephone Company and its servants any duty in regard to the proper insulation or position of its wires at the place where the wires ran over the roof of the building No. 41, and if it did, whether the plaintiff in going to the side of the roof as he did to look down upon the roof of No. 45 for the purpose of find-

ing out how he could get down upon it, was in the exercise of due care.

The first prayer of the defendant for instructions raises the question whether, upon all the evidence, the plaintiff can recover. We doubt if the plaintiff offered sufficient evidence that he was in the exercise of due care at the time and place of the accident. It was daylight, the wires were visible, and the plaintiff knew that some of the wires might be dangerous. If we assume that as against the owner of the building No. 41 he was rightfully on the roof of that building for the purpose of going down upon the roof of the building No. 45, there was on the side of the roof a long distance unobstructed over which he could have looked down with safety. The plaintiff could look down upon the roof of No. 45 in his own way, and the safe place to do this was obvious. Instead of selecting a safe place, he unnecessarily stooped under some wires which he saw and knew might be dangerous, without noticing another set of wires lower down which were in plain sight. In consequence of this conduct, his hand accidentally came in contact with one of the alternating electric light wires at a point where the insulation was worn off, and he received his injury. If necessary to the decision, it would certainly deserve consideration whether this conduct does not show an unnecessary exposure to a danger which the plaintiff knew, or ought to have known. See *Lothrop* v. *Fitchburg Railroad*, 150 Mass. 423. Without determining this question, however, we are of opinion that the defendant, on the evidence, owed no duty to the plaintiff to have its wires properly insulated at the place where he received his injury, or to have its wires at that place supported so far above the roof of the building No. 41 that the plaintiff would not come in contact with them when on that roof. On the evidence recited in the exceptions, the most favorable inference for the plaintiff is that the Telegraph and Telephone Company was permitted by the defendant to use its standard on the building No. 45 Temple Place, and that therefore the plaintiff, as the servant of the Telegraph and Telephone Company, engaged in its business, had an implied license from the defendant to go upon the roof of this building and attach telegraph and telephone wires to its standard. Whatever may be the duty of the defendant toward its licensees, it must be

confined, we think, to licensees when acting within the scope of the license, and the defendant had no reasonable ground to expect that the servants of the Telegraph and Telephone Company would approach this standard in the way used by the plaintiff. If the presumption is that the defendant maintained this standard on the roof of the building No. 45 by contract with or permission of the owner of that building, the inference would be that it had a license from the owner to go through his building upon the roof for the purpose of reaching the standard and attaching wires to it, and this license might be available to the servants of other companies which were permitted to use the standard, if the standard was erected or maintained by the defendant for the use of other companies as well as of itself. *Doty* v. *Gorham*, 5 Pick. 487. This was the most direct way of reaching the roof of No. 45, and was the way provided by the owner of the building for reaching the roof, and there was nothing in the situation of this and the adjoining buildings indicating that the roof of building No. 41 was to be used for the purpose of reaching the roof on No. 45. The right to go upon the roof of No. 41 for this purpose could only be derived from the owner or occupant of that building. Whatever may be the duty of the defendant in stringing its wires over the roof of No. 41 to the owner of that building and his servants, we see no evidence that the defendant intended to authorize the use of this roof by the Telegraph and Telephone Company, or had any right to permit the servants of that company to go upon it. Whatever duty on the evidence the defendant owed to the plaintiff as servant of the Telegraph and Telephone Company, under its license to that company to use the standard for the support of telegraph or telephone wires, this duty cannot be held to extend over the whole circuit of the defendant's wires, and the defendant was not required, for the protection of the servants of the Telegraph and Telephone Company, to maintain an effectual insulation of its wires over other buildings than that on which the standard was placed, at places where the defendant had no reason to expect that the servants of that company would go in the performance of their duties in using its standard, and where the defendant had neither invited nor licensed hem to go.

The first two counts of the declaration are at common law; the third count is under Pub. Sts. c. 109, § 12, and St. 1883, c. 221. The court required the plaintiff to elect whether he would rely upon the first and second counts, or upon the third, and he elected to rely upon the first and second. As the exceptions must be sustained, and there may be a new trial, it is proper to notice the contention of the plaintiff under the third count, as in the event of another trial the plaintiff may rely upon that count. The Pub. Sts. c. 109, § 12, provide that, "when an injury is done to a person or to property by the posts, wires, or other apparatus of a telegraphic line, the company shall be responsible in damages to the party injured," etc. St. 1883, c. 221, is as follows: "All provisions of law granting to persons and corporations authority to erect, lay, and maintain, and to cities and towns authority to regulate, telegraph and telephone lines, except sections sixteen and eighteen of chapter one hundred and nine of the Public Statutes, shall, so far as applicable, apply to lines for the transmission of electricity for the purpose of lighting." This last statute relates solely to the authority to erect, lay, and maintain lines for the transmission of electricity for the purpose of lighting, and to the regulation of such lines; it does not relate to the liability of electric light companies for injuries received by any person from the posts, wires, or other apparatus of such companies. This renders it unnecessary to consider whether § 12 of Pub. Sts. c. 109, was intended to include injuries received from an electric current transmitted through wires. It has been argued that this could not have been intended by this section, as telegraph currents are not dangerous.

In the view we have taken of this case, the questions arising on the demurrer need not be determined.

*Exceptions sustained.*