## New Omaha Thomson-Houston Electric Light Company v. Fred Anderson, Administrator.

### Filed January 5, 1905.   No. 12,180.

1. **Fireman: Licensee.** In the absence of any municipal ordinance or statute changing the rule, a fireman who entered upon property without any special authority or invitation of the owner is a bare licensee, made such by public necessity and takes the risk of the premises as he finds them.

2. ———: **Electric Wires: Injury.** A member of a truck company, who assists to hoist a ladder with metallic corners against an electric light wire, cannot, in the absence of invitation or permission of the owner, complain that the wires were not properly insulated and that he was injured because of such lack of insulation.

3. **Injury: Appliances.** A claim for injury by an electric shock cannot be sustained by a mere hypothetical claim that such shock was only rendered possible by a ground current negligently permitted at some other point in the circuit by defendant, it not appearing that any usual precautions to prevent such "grounding" had been omitted or that defendant had or under the circumstances ought to have had knowledge of it.

4. **City Ordinance: Duty of Electric Company.** Section 1 of ordinance numbered 4,363 of the city of Omaha, *held* to impose no duty on the defendant light company except to furnish a competent lineman to act under the city authorities' direction in disconnecting wires.

5. **Electric Companies: Not Insurers.** The furnishing of electric currents for power and lighting purposes is a recognized business which must be conducted with due regard to the safety of both employees and the public in view of the dangerous character of such currents, but their furnishers are not insurers against all dangers from them. Blameless casualties may arise from their operation.

6. ———: **Agent: Ordinance.** A lineman of the electric light company, while acting at fires under the direction of the city authorities in pursuance of the ordinance before mentioned, cannot render the company liable by his words or acts in the absence of special authority.

7. **Pleading and Proof: Negligence.** *Held*, That in the present case there is neither allegation nor proof that defendant, after knowledge of the dangerous position of deceased, negligently omitted to turn off its electric currents.

ERROR to the district court for Douglas county: IRVING F. BAXTER, JUDGE. *Reversed.*

*W. W. Morsman,* for plaintiff in error.

*James H. Van Dusen, contra.*

HASTINGS, C.

In this case the intestate of the plaintiff died August 9, 1899, as a result of an electric shock received by him while serving as a fireman in lowering a truck ladder by means of cranks. The ladder was so constructed with straps along its side that it presented metal corners capable of cutting the insulation on defendant's wires, and it had a metal connection from the top to the bottom capable of carrying down electric currents. The wooden spokes of the wheels of the truck on the platform of which the ladder was resting constituted an insulator, and the firemen in wet clothing holding the cranks by which the ladder was being lowered, and standing with wet feet upon wet ground, served to complete the ground connection, and a current down the ladder, through the cranks, and through the workmen to the ground was the result. The fire had occurred on the south side of Howard street, between Eleventh and Twelfth streets, in a building running back to the alley; 40 feet above the alley the defendant company had secured the right to maintain its conducting wires and was maintaining them there to the number of 11. The wires were carried on what is known as an "arch," a piece of timber resting upon poles at each side of the alley. The "arch" crossed the alley practically on a line with the west wall of the burning building. Of the 11 wires, numbering them from the south, the first, second and third were not touched by the ladder; the fourth and fifth constituted what is called "Opera House Circuit," and when in use carried a current of 2,000 volts; the sixth was one side of a street arc-light circuit,

the other side passing back by another route; wires 7, 8 and 9 belonged to a secondary circuit used for supplying incandescent lights, and intended to carry a maximum current of 216 volts; the other two wires were used for supplying power, and when in operation carried a current of about 500 volts, according to the testimony. One witness says that the insulating material on the wires was apparently ragged, but no one claims that there was, before contact with the ladder, any uninsulated wire at the places of contact. The fire occurred about, or shortly after, five o'clock on August 9. A hose was laid from a hydrant near the intersection of the alley with the west side of Twelfth street, along the alley to the rear of the burning building. The truck, with this ladder, entered the alley at Eleventh street and came west until opposite the north end of the burning building. The truck stopped under the wires with the front toward the west and on the north side, so that by the slope of the alley toward its center line, the south side of it stood a little lower than the north. It carried an extension ladder which could be raised about 75 feet and which extended back from its base on the truck about 40 feet. It was raised by means of cranks and machinery attached to the front axletree of the truck. The machinery comprised a turntable, by which the ladder, when raised, might be turned through the use of the crank to face any desired direction. The ladder was of 700 or 800 pounds weight, and 32 inches wide. The "barrels" of the ladder were bound with iron straps, making sharp iron angles on the outside corners of the "barrels." It was old, and would sway from side to side, and spring up and down in the process of raising. Iron straps on its side were connected from the top to the bottom and with the machinery to which the cranks were attached. The truck also carried a portable ladder about 54 feet long, and others of various lengths from 18 to 35 feet, and a pair of insulated shears for cutting electric wires. The city electrician, Schurig, was present when the truck came into position.

When the ladder was just commencing to be raised, the electrician was standing about 10 or 15 feet in front of the truck. Lieutenant Sullivan, now captain, in control of the truck, asked if the wires ought to be cut. The electrician replied that they should and that he would cut them if the lieutenant would clear the alley. The deceased did not, apparently, hear this. The upper end of the ladder came up against two wires, and Mr. White, one of the truckmen, went up and lifted these two wires off and placed them—number 6 to the south and number 7 to the north of the ladder. He hesitated about doing this, and was told by Schurig that the wires on the north were low-pressure ones, and that on the south was the arc-light circuit, and, if so, the truckmen would be all right; that the north one was harmless, and the south one dead at that time of day. The ladder then rested between these wires numbered 6 and 7, where it remained until finally removed. It was raised to a perpendicular position, and in the process approached the arch which was on a line with the west wall of the building. When it reached this perpendicular position it was some six or seven feet east from the arch. On the arch the wires were fastened 14 inches apart. It then extended four or five feet above the wires and was turned about, facing toward the south, and was permitted to incline south toward the burning building. The upper end remained five or six feet away from the north wall of the building. The ladder was then extended 25 feet more above the wires, and remained so until the fire was extingushed and it was ordered taken down. It was then once more drawn to a perpendicular position, brought by the use of the turntable so that the rungs were once more at right angles with the alley and with the wires, and by means of the cranks the men were proceeding to let it down between the same wires. They had not made to exceed two turns of the cranks, which would let the ladder move toward the east along the wires about two feet, when it caught upon the arc-light circuit wire numbered 6, on the south side. This prevented its

coming further.  Livingston, a fireman, started up the ladder to loosen it, declining to take officer Sullivan's gloves because they were wet.  Defendant's lineman, Brinkman, who had come to the fire and was standing by, remarked, "That wire is dead" or "Those wires are dead." The ladder was then held fast on the south side by this wire numbered 6, and Livingston was unable to release it until it was raised nearly two feet.  This was done, and he released the wire without shock.  The ladder was not then in contact with wire numbered 5.  Livingston went down, and with the other men proceeded to lower the ladder, making five or six revolutions of the cranks, when the shock was received by which four of the men were killed.  The shock did not produce instant death or throw the men from the cranks, but rendered them incapable of letting go and held them until life was so nearly extinct that their bodies fell to the ground.  The men were wet both by water and perspiration, and they were standing in pools of water and mud.  Farmer and Livingston, who also had hold of the cranks, received only slight shocks.  All the evidence goes to show that at the time of the electric discharge the ladder was in contact with wires 6 and 7 only; such is the testimony of the city electrician.  It is hardly possible that there can be any error about this, for the ladder was left standing some time in the position in which it was when the shock came, and was not taken down until the defendant's lineman, Brinkman, had telephoned to the power station and had the currents through this alley all cut off.

The foregoing statement is drawn for the most part from the brief filed on behalf of the defendant company. Plaintiff's counsel, as to defendant's statement of facts in the brief filed, says: "I desire to state that it is in the main a fair statement, although I would not be willing to admit that all propositions therein stated were established by the undisputed testimony." The only important matter of fact as to which any dispute is found is concerning the insulation of the wires.  The legal duty of

defendant, as fixing the question of its negligence, is the main subject of dispute, together with the inferences to be drawn from the facts, and especially the extent to which the fact of a terrible casualty should be considered as establishing negligence on the principle of *res ipsa loquitur*.

The defendant claims that it owed no duty whatever to the fireman Hopper in reference to its lines. It is conceded that these firemen in pushing their ladder against defendant's wires were not trespassers, because they were acting in public right and were entitled to invade the defendant's property for the purpose of securing public protection against fire; but it is claimed that they were bare licensees who pushed their ladder against defendant's wires, without permission, for their own purpose, and at their own risk.

It is also urged that no defect of insulation, which was in any degree the company's fault, is shown to have had anything to do with the accident. The defendant admits that one witness, Rudousky, testified that the insulation on these wires near this place was ragged and hung in strings; but he did not testify, nor did any one else, that it was so at any spot where the ladder came in contact before its metal corners scraped the wires. Plaintiff's counsel, evidently, does not rely upon defects of insulation as sustaining the claim of defendant's negligence.

The averments of negligence in the petition, denied by the answer, are stated in the brief of the defendant company as follows:

"1. That the defendant negligently and in disregard of its duty did not keep its wires at the scene of said fire securely insulated, so as to prevent electricity escaping therefrom to objects that should come in contact with them. 2. That the defendant negligently and carelessly allowed the wires aforesaid to become grounded, or so connected with the earth as to allow the current of electricity carried thereby to escape into the earth, and failed to so construct its system of wires as to prevent connec-

tion with the earth, which would carry the current of electricity to the earth. 3. That the defendant negligently and carelessly failed at said time to disconnect the wires in said alley, so as to prevent them becoming a menace to the lives of the firemen, and plaintiff's intestate. 4. That the defendant negligently and carelessly failed to notify plaintiff's intestate and the other firemen that the said wires, or any of them, were grounded or connected with the earth, so as to carry the current of electricity to the earth, and thereby render them dangerous to life. 5. That the defendant failed and neglected to notify the said Charles A. Hopper and others that the said wires were charged with electricity, which would be dangerous to the lives of persons coming in contact with them. 6. That the defendant negligently and carelessly failed to keep its wires so insulated and protected that the said Charles A. Hopper and others would not be injured as a result of coming in contact with them. 7. That the lineman in the employ of the defendant, when the ladder was about to be lowered to the truck, notified the firemen and Charles A. Hopper that the wires upon. the poles in the alley were dead wires, and that it was not until after such notification that the firemen and said Hopper commenced to lower the ladder by means of the machinery upon said truck."

This summary is acknowledged by plaintiff's counsel to be correct except for one omission. Plaintiff says that the petition also charges that it was the defendant's duty under the city ordinance to have its lineman at the scene of the fire for the purpose of removing "deadly wires," so that plaintiff's intestate would not be injured by them, but that the defendant negligently failed to perform such duty to Hopper's injury. The summary therefore, with this addition, may be taken to fairly represent the case which the plaintiff seeks to make. It is that defendant's wires were not properly insulated; were negligently permitted to become "grounded"; were not disconnected at the fire, so as to prevent their being a menace to life;

that no notice was given as to the grounding; that no notice was given of danger from the wires; that deceased was told by defendant's lineman the wires were "dead," and after such notification the ladder was lowered upon them; and that defendant failed in its duty under the ordinance "to have its men on the ground for the purpose of removing deadly wires, so that plaintiff's intestate would not be injured thereby." Plaintiff's counsel is still, he says, insisting on each of these claims, but his brief lays no stress upon the matters of insulation and "grounding." The action of the defendant's lineman and the failure to discharge its duty under the ordinance constitute, apparently, the negligence relied upon. The matter of "grounding," that is, the claim that no dangerous current would have come down the ladder if there had not been permitted to exist some other connection with the ground to complete the circuit, and that the permitting of such other connection was negligence, is not argued, except by reference to another case. This other "grounding" is entirely hypothetical. If it existed it was without defendant's knowledge, then, or. since, so far as the evidence shows, and has never been located. If any liability arose on its account it would be on the theory that an electric current is like a dangerous animal for whose restraint the keeper is absolutely liable. Some expressions drawing such an analogy are quoted by plaintiff from various decisions, but no holding of such a liability is cited.

As above suggested, the defendant declares that it owed no duty to these firemen whatever; that such right of entry as they had upon defendant's wires they had against the wires and not against the owner; and that, by way of preparation for such invasion, the owner was not bound to insulate, nor to do anything except refrain from resistance and from establishing anything in the nature of a trap, to the firemen's injury; that the latter were bare licensees, and that the duty of the company is fully discharged if it permits them without resistance to go upon

its premises. "The law of overruling necessity licenses this, and will not suffer the owner of a lot to stand at its borders and exclude those who would use his premises as vantage ground in staying the conflagration." 1 Cooley, Torts (2d ed.), *313.

Defendant cites *Omaha & R. V. R. Co. v. Martin,* 14 Neb. 295, a case in which one driving where the public had been accustomed to pass on the company's premises fell into a hole, and was held to have no right of recovery against the railroad company who dug it, because the company had not invited him to come on its premises and had assumed no responsibility for his safety there.

In *Redigan v. Boston & M. R. Co.,* 155 Mass. 44, it is held that a bare licensee has some rights; the landowner may not shoot him, and may not run him down without proper warning. The landowner may be responsible if he arranges a trap expecting the licensee to fall in, but as a general rule the latter comes at his own risk and must take the premises as he finds them.

In *Richards v. Connell,* 45 Neb. 467, the owner of a pond of a dangerous depth is held not required to fence it or to otherwise insure the safety of strangers, old or young, who may come to the premises, not by invitation, expressed or implied, but for purposes of amusement or from motives of curiosity. In that case this court say that liability of the owner for injury incurred on his premises results in three classes of cases: 1. Where the owner has made or permitted some construction dangerously near to a public highway, so as to injure one in the rightful use thereof. 2. Has left negligently exposed dangerous machinery likely to attract children and resulting in their injury, as in the turntable cases, which constitute a recognized exception to the rule. 3. Where the injured party was present by the invitation, expressed or implied, of the owner.

In *Hamilton v. Minneapolis Desk Mfg. Co.,* 78 Minn. 3, 80 N. W. 693, where a fireman fell through an uncovered elevator shaft, it was held that he could recover

no damage for his injury, and the rule is stated as fol-
lows:

"By the rules of the common law, a fireman going upon
the premises of another, under the circumstances appear-
ing in this record, could not recover damages for such an
injury. However hard such a rule may seem, it appears
to be settled that the owner or occupant of a building
owed no duty to keep it in a reasonably safe condition for
members of a public fire department who might, in the
exercise of their duties, have occasion to enter the build-
ing."

In *Woodruff v. Bowen,* 136 Ind. 431, 34 N. E. 1113, in
which the plaintiff's intestate and ten other firemen were
killed by the falling of a roof on which they were stand-
ing in discharge of their duty, negligence in constructing
the building and knowledge of its unsafe condition on the
part of the owner were alleged. Recovery was refused.
The court say:

"We think that the authorities fully establish the rule
that the licenser owes to the mere licensee no duty except
that of abstaining from any positive wrongful act which
may result in his injury, and that the licensee takes all
risk as to the safe condition of the premises upon which
he enters. To the question now under discussion, de-
cisions based upon expressed statutes or ordinances, as
well as decisions based upon the fact that the injured party
entered the premises under an invitation, express or im-
plied, are not applicable. We are of the opinion that the
owner of a building in a populous city does not owe it as
a duty at common law, independent of any statute or
ordinance, to keep such building safe for firemen or other
officers, who, in a contingency, may enter the same under
a license conferred by law."

A similar holding is found in *Faris v. Hoberg,* 134 Ind.
269, 33 N. E. 1028, where the plaintiff entered a store
from the alley at the back door and fell into an open ele-
vator shaft; the visitor was held to be a mere licensee and
unable to recover, because there was no duty on the

owner's part to keep the premises safe for such an intrusion.

In *Augusta R. Co. v. Andrews,* 89 Ga. 653, a lineman for a telephone company in doing his work placed a telephone wire above and across a fire-alarm wire, and for this purpose ascended the pole of the fire-alarm system, and while on the pole, in passing the telephone wire over the fire-alarm wire, he received an electric shock whch caused him to fall; he claimed that a street railway company had been negligent in constructing a feed wire so that it came in contact with the fire-alarm wire and charged it with a dangerous current, and that this negligence was the sole cause of his injury. It was held that the street railway company owed him no duty and was not liable for any injuries that happened to him while, without permission, he was a trespasser upon the pole of the fire-alarm system.

*Hector v. Boston Electric Light Co.,* 161 Mass. 558, also on rehearing, 174 Mass. 212, is a case wherein the electric company and a telephone company were jointly using a standard on the roof of a building in Boston to support their wires; they also maintained their wires over the roof of another building, but not jointly, their wires there being in separate groups. Plaintiff, a lineman of the telephone company, went on the second building by permission of the owners. While on this roof he went to the electric company's wires to look down at the other building, and came in contact with one of that company's wires from which the insulation was gone, and he received an injury. It was held that the light company owed no duty to the plaintiff to have these wires insulated at that point; that he had no authority from the light company to approach its wires on the second building, and that if he did so and received an injury there could be no recovery.

In *McCaughna v. Owosso & Corunna Electric Co.,* 129 Mich. 406, 89 N. W. 73, one who was passing over private grounds where the public sometimes went, but in the face of a warning from the owners not to do so, was held to

acquire no right of action for a fatal shock from a guy wire charged with electricity from defendant's plant.

The controlling precedent is said to be *Hargreaves v. Deacon*, 25 Mich. 1, in which recovery was denied for the death of a child of tender years, who fell into an uncovered cistern, not adjoining a highway, and which had not been left uncovered with design or expectation to harm anyone.

The cases seem to establish that, in the absence of any statute or ordinance prescribing a duty toward firemen on the part of the owner of premises, the latter is not liable for anything short of a designed injury. The trial court, however, seems to have instructed the jury on the theory that there was a duty to insulate for the protection of firemen, merely as such, and that there was evidence of this duty having been unperformed. We are constrained to think that under the circumstances the firemen had no right to rely upon any insulation, and that there is no sufficient evidence that a failure to properly insulate defendant's wires had anything to do with causing this injury. The trial court instructed as to this matter as follows:

"I further instruct you that those who employ, in the prosecution of their business, a palpably and highly dangerous agency, such as electricity, are bound to exercise such precautions to prevent injury to others as the emergency would reasonably seem to require, and where wires of an electric company extend along, over and above the streets and alleys of a city, carrying a highly dangerous current of electricity, the law requires the exercise of care, skill and caution commensurate with danger to be apprehended, in the construction, inspection and repair of the wires, so as to keep them harmless at places where persons are liable to come in contact with them."

By the 9th instruction the jury were told that if they thought that a reasonable degree of care and skill required defendant to keep all its wires securely insulated and keep them from ground connections, then a failure to

exercise such caution would be negligence and render defendant liable, and that whether or not such care had been exercised by the defendant was a question of fact for the jury's decision.

The 10th instruction was in these words:

"The evidence shows that Hopper at the time he lost his life was engaged at work in this alley, where he had a right to be, in pursuance of duty under his employment by the city of Omaha as a public fireman. You are instructed that it was therefore the duty of the defendant company to use and exercise care, skill and caution commensurate with the danger to be apprehended, as explained in these instructions, in the insulation of its wires running over and along the said alley, and in the transmission of the currents of electricity on said wires, at such places as the deceased in the proper discharge of his said duties might come in contact therewith."

No attempt is made on the part of the plaintiff to sustain this portion of the case. No authority is given for throwing on the company an absolute duty to so insulate its wires as to resist attacks, such as are shown in this case, nor for a like duty as to preventing ground connections. It is not thought that while operating its lines the defendant company was an insurer to either firemen or others that the insulation of its wires could not be penetrated by the edges of this ladder. A jury ought not to be permitted to find such a duty, as a matter of fact, from the evidence in this case.

It is urged, however, that there was a duty resting upon the defendant at the time of this accident to "disconnect and remove any wires or cables which might become a menace to life and property." Sections 53 and 131 of the city charter, as then existing, are cited as giving the city council general authority to make police regulations for the welfare, health, safety and security of the city, and to pass proper ordinances therefor. Special authority was given to regulate and provide for street lighting, electric power or other apparatus, and to regu-

late electric wires, poles and the placing of wires thereon, or to require their removal from public grounds, streets or alleys. March 1, 1898, the following ordinance was adopted:

"Section 1. That all corporations, companies and individuals owning and operating overhead wires shall in time of fire send one or more linemen to the scene of fire, who shall report to the chief of the fire department or the city electrician, and they shall disconnect and remove any wires or cables which may become a menace to life and property."

It is claimed on behalf of the plaintiff that under this ordinance it was the defendant's duty to have a lineman at the fire and to decide at its peril what wires were a menace to life and property, and if any were found to be so to remove them. The defendant on the other hand says that the only duty imposed upon the company by this ordinance is to furnish a lineman, and at this fire one was present; the defendant asserts that the provision for the lineman to report for duty to the chief of the fire department or to the city electrician, and that "they shall disconnect" any unsafe wires, makes the lineman a mere subordinate whom the light company must furnish to act under the orders of the chief of the fire department or the city electrician. Defendant says that it is obvious that the general control at a fire must be in the hands of the city authorities; that it is plain that the ordinance intended to confer no authority upon the defendant as to what wires should be removed or disconnected, and that it therefore leaves the defendant no responsibility. It  seems that prior to this ordinance the city had its own fire-alarm system and had linemen in its service, who were attached to the fire companies to attend fires and take care of wires; that the fire-alarm service was turned over to the telephone company, and by this ordinance the electric company was required to furnish the linemen. It is urged that the city retained the same control over them which it had previously held over those employed by itself.

10

Counsel for plaintiff says that this ordinance is a remedial one and is to be liberally construed so as to remedy the mischief which existed. This may be granted, but what is the michief to be remedied? The firemen have the right to go upon premises and take such measures as they find necessary for the purpose of preventing or extinguishing fires, and no citizen has any authority to resist any action which they may take. They are not, however, presumably skilled in the handling of electric wires. The defendant's lineman is presumably able to make connections and disconnections without risk to himself or others. It seems rational to conclude that he is required for that purpose, and that this police control of emergencies and power to direct action as to wires must remain with the city authorities, and that they are not under obligations to accept any advice, orders or instructions from these linemen who are required to report to the fire chief or city electrician.

Plaintiff claims that the pronoun "they" as used in this ordinance refers to the linemen. Doubtless it refers to the linemen together with the city electrician and chief of the fire department, as the case may be. The disconnection must be, as above stated, in the control of the city. It is apparently intended to be carried out by the linemen. It may be granted that, if the absolute duty to remove all wires dangerous to life and property rested upon the defendant, the evidence in this case shows conclusively such duty was not performed. The wires were not removed, and the death of four firemen from contact of their ladder with these wires resulted. With the contention of counsel, however, that the defendant was in such control of the management of the electric wires in connection with the raising of this ladder on the part of the firemen as to cast upon it any such absolute liability, it is not possible to agree. The ordinance cannot be construed to create such a liability. We do not think a violation of it by defendant was shown.

It is contended on plaintiff's behalf that there is a

cause of action against the defendant arising out of the statement of defendant's lineman made as Livingston was ascending the ladder to release it when caught against wire numbered 6, the arc-light wire, "That wire is dead," or "Those wires are dead." It is claimed that Brinkman was acting as a servant of the company; that his words were an invitation to continue lowering the ladder between the wires, and render defendant liable for the consequences. It is claimed on the other hand by the defendant, with extensive authority, that Brinkman in acting as a lineman at that fire was acting, not on behalf of defendant, but as a lineman for the city; that responsibility for the acts of a servant depends upon authority over him; that the defendant was compelled to furnish linemen, but had no authority or control over them and was no more responsible for what he said than for how he acted.

*Western Union Telegraph Co. v. Mullins,* 44 Neb. 732, is cited for the following passage:

"It is familiar law that a master is not liable for the acts of his servants unless those acts have been done in the line of the servant's duty and in furtherance of the master's business, or, as sometimes expressed, the acts must be within the servant's apparent scope of employment."

In that case misinformation as to the relative location of Glenwood Springs, Colorado, and Seattle, Washington, by the telegraph company's agent was held to give no right of recovery, although it was in connection with the delivery of a message and the misinformation caused the plaintiff considerable expense. The telegraph company's clerk was held to have no employment warranting him in giving to travelers such information on behalf of the company.

In *National Fire Ins. Co. v. Denver Consolidated Electric Co.,* 16 Colo. App. 86, 63 Pac. 949, where the owner of a building had been misled to his prejudice by misstatements that there was no danger to a building from the

wiring, he was held to have no right of action against the company, the servant having no authority to advise outside of the particular adjustment he was sent to make.

In *Coughlan v. City of Cambridge,* 166 Mass. 268, the city was held liable for an injury to an employee engaged in working on a gravel train which had been furnished under contract, with its equipment fully manned, to the city by a railway company; it was held that the negligence by which plaintiff was injured was negligence of the city. "The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired." To this last proposition four other Massachusetts and one English case are cited.

*Miller v. Minnesota & N. W. R. Co.,* 76 Ia. 655, 39 N. W. 188, and *Hitte v. Republican V. R. Co.,* 19 Neb. 620, are cited to the same proposition. In the last named case suit was brought for the killing of plaintiff's intestate by a train on defendant's road, but it was shown that, at the time, the road was in process of construction, and the entire work, including the management of the train which did the injury, was under the control of the contractor, and the train and its crew were furnished to the contractor by the railroad company to advance the work. It was held that there could be no recovery. "In the case 'it appeared' that Fitzgerald was clearly an independent contractor. He had the use of the engine and cars of the defendant as a part of the consideration for the work performed by him, and if the engineer and fireman of the train which did the damage were borne upon the pay rolls of the defendant while working on the contract, as claimed by counsel for plaintiff, * * * doubtless their compensation was fully accounted for by the contractor to the company. I conclude, therefore, that the train * * * was not being run by nor under the control or management of the defendant company, and that the defendant is not bound to respond to any damage, if any,

suffered through or by reason of negligence of the engineer, conductor or other persons in charge of the said train."

It appears in the present case that the city electrician was present and that he had, before any statement by Brinkman, told the lieutenant in charge of the truck company that one of the wires against which the ladder was being pressed was dead at that time of day, and that the other was a low-pressure one. Brinkman's assurance was simply added to his, and the action of Livingston in going up and loosening the ladder was already in progress when Brinkman made this remark, "That wire is dead," or "Those wires are dead." White had previously gone up and safely lifted both of these wires out from between the "barrels" at the head of the ladder. The work which was then under way was successfully accomplished on the part of the fireman who, with his bare hands, picked up this wire numbered 6. It is true that he was standing on a rung of the ladder and not upon wet and muddy earth. It must be conceded that if the defendant had an absolute duty to perform in the removal of these wires and the taking away of any which was a menace to life and property, the lineman sent to perform that duty on defendant's behalf would be acting for defendant, and his negligence would be the company's. But, as above stated, we do not think that any such absolute duty can be claimed to result either from the general doctrines of the law or from this ordinance of the city.

A large part of plaintiff's brief is devoted to the proposition that the defendant is chargeable with knowing of the deceased's dangerous position, and with almost, if not quite, criminal negligence in continuing to send its current through these wires notwithstanding such knowledge. We have been unable to find in the petition an allegation of negligence in this particular. It is true that the third allegation of negligence is that the defendant failed to disconnect the wires in said alley, so as to prevent them becoming a menace to lives and the firemen and plaintiff's

intestate, but this cannot be considered an allegation of failure to turn off the current after learning the position of the firemen.   The plain intention of the pleader was to complain of the inaction of the linemen who were present at the fire. They, however, had no more knowledge than had the city electrician that there was any occasion for turning off the current. The evidence seems to show that, for some unexplained cause, a most surprisingly severe shock came from one of the low-pressure wires which the linemen, like the city electrician, supposed was harmless. There is no evidence for the support of this claim of neglect to exercise due care after the firemen were known to be in danger, except the fact that the firemen are dead and that it was undoubtdly an electric shock which killed them.   "*Res ipsa loquitur*," as counsel says.   But it is only when defendant is under an absolute duty to prevent results that their appearance shows negligence.   Black's Law Dictionary, *sub voce*.

It is not necessary in this instance to pass upon the defendant's contention that there must be some contractual relation, actual or implied, between the injured party and the person whose negligence is asserted in order to create a cause of action by a mere failure to perform.   In other words, there must be a legal duty.   If the injury to this fireman had arisen when he was engaged merely in working upon the surface of the street instead of raising a ladder in the air to touch these wires, another question would be presented.   The defendant was only authorized to make such use of the alley as would not interfere with its use as a highway.   It must put no dangerous constructions near enough to the highway to imperil those rightfully passing.   Danger to firemen pushing a metallic bound ladder against the wires, it had no duty to provide against, except by furnishing a lineman to disconnect them if deemed necessary by those in charge of the fire extinguishing operations.

In the case of *Mitchell v. Raleigh Electric Co.*, 129 N. Car. 166, 85 Am. St. Rep. 735, it was held that, where a

telephone company and a lighting company jointly oc-
cupied the streets, such joint occupancy gave enough of
relationship between the parties so that a telephone line-
man who was injured because of defective insulation
in the lighting company's wire had a right of action.
But this case is clearly distinguishable from that of
a fireman who invades the lighting company's wires with
a ladder likely to cut the insulation on them, and who can
claim no right at the wires except to go there without
resistance from the defendant.   The fireman's rights were
wholly against the wires and not against the owner.   The
owner was without knowledge of his intention to use the
ladder, and was under no obligation to render its use safe
or to attempt to do so.   If the city requires better pro-
visions for the safety of its firemen from these dangerous
wires, it is entirely competent for it to so provide by
ordinance. ( In the present case it seems impossible to
charge any failure of legal duty against the defendant
upon the record made here. / Of course, in such case there
is no need to discuss any question of contributory negli-
gence.

A careful consideration of the record and each of the
briefs of parties, together with the brief for defendant in
error in the case of Bendsen against the same lighting
company, which is cited by plaintiff's counsel, compels the
conclusion that no duty to insulate for the protection of
these firemen rested upon defendant at common law or by
the ordinance. / In the *Bendsen* case counsel urge that the
defendant company, with its wires, is itself only a licensee
in the alley, and had not the rights of an ordinary prop-
erty owner in these wires, which the city allows it to put
up.   Doubtless the city has the right to prescribe the
terms on which they may be maintained.   When those
terms are complied with, however, the property of the
lighting company has all the incidents of other property,
except as those terms modify it.   No modification except
the compulsory attendance at fires of a lineman has been
pointed out.   It would seem that the defendant, as the

owner of the wires, maintaining them at the required distance above the alley, had the same rights in them as the owner of a building would have in it, and that firemen would take the risk in pushing their ladder against the wires, as they would in going against a building. The requirement to send a lineman to disconnect wires does not seem sufficient to change the rule. It seems to give no authority and, consequently, to impose no responsibility on the defendant. If the last proposition is true, then the lineman, Brinkman, did not make his remark as to the wire being dead in his employment for defendant, but while acting for the city.

It is recommended that the judgment of the district court be reversed and the cause remanded.

KIRKPATRICK and LOBINGIER, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and the cause remanded.

REVERSED.