### DETERMINED IN THE

# FIRST DISTRICT

#### OF THE

# APPELLATE COURTS OF ILLINOIS

#### DURING THE YEAR 1907.

---

## James H. Eckels et al., Receivers, v. Katherine Maher, Admx., etc.

### Gen. No. 13,896.

1. EXPLOSION—*when owner of premises not liable for personal injuries resulting from.* The owner of premises in which a water-closet is maintained not ventilated as required by ordinance, is not liable for personal injuries resulting to a mere licensee upon such premises from an explosion of gas.

2. LICENSEE—*when person lawfully upon premises is.* A person lawfully upon premises by the permission of the law, but without the invitation of the owner, is a mere naked licensee, to whom the owner owes no duty other than to refrain from wilful or affirmative acts injurious to him.

Action in case for death caused by alleged wrongful act. Appeal from the Superior Court of Cook county; the Hon. JAMES A. CREIGHTON, Judge, presiding. Heard in this court at the October term, 1906. Reversed. Opinion filed October 28, 1907.

Statement by the Court. The appellee, plaintiff below, as administratrix of the estate of Phillip Maher, deceased, sued the appellants, as receivers of the Chicago Union Traction Company, and recovered judgment against them for the sum of $5,000, from which judgment this appeal is. The declaration consists of two counts. In the first count it is averred, in substance, that about March 12, 1904, the defendants, as

(45)

such receivers, were possessed of certain premises in the city of Chicago, with a certain building thereon, in which there was a certain water closet, and that, at and long before said time, the following section of an ordinance was in force in said city:

"1456. Water closets. Water closets shall not be placed in any unventilated room or compartment. In every case the room or compartment must be open to the outer air or be ventilated by means of an air duct or shaft. Interior water closets shall not be supplied from the city supply pipes direct. All water closets within the house shall be supplied from special tanks or cisterns, the water of which is not to be used for any other purpose. A group of water closets may be supplied from one tank, but water closets on different floors shall not be supplied from one tank. In tenement houses there shall be a separate cistern for each water closet, excepting that in a cellar or unfinished basement the cistern may be dispensed with. One water closet shall be provided for each two families."

It was defendant's duty to maintain said water closet "in a safe condition for the use of those lawfully entitled thereto, and to comply with the above ordinance intended for the use and protection of all persons lawfully using said water closet." The defendants permitted said water closet to be in a room or compartment not open to the outside air or ventilated by an air duct or shaft. On the day aforesaid Phillip Maher was a police officer of the city of Chicago, and, in the course of his duty as such officer, he entered said water closet for the purpose of inspecting the same, and while so doing, and while in the exercise of due care for his safety, an explosion occurred in said closet, as a direct result of said negligence of the defendants, by means of which said Maher sustained injuries which caused his death shortly thereafter, leaving his widow, Katherine Maher, his sole heir at law and next of kin.

In the second count the following section of the ordinance is set out and relied on:

"1459. Water closets outside of buildings. Where water closets are placed outside of buildings, the chief inspector must be notified before work is started. Water closets, when placed in the yard, must be separately trapped and so arranged as to be conveniently and adequately flushed, and their water supply pipes and traps must be protected from freezing. The compartment for such water closets must be ventilated by means of slatted openings in the door and roof."

In this count it is alleged that the defendants permitted and allowed said water closet "to be and remain in a room or compartment, which said room or compartment was not ventilated by means of slatted openings in the door or roof." In other respects this count is substantially the same as the first, except that it only sets up section 1459 of the ordinance. The defendants pleaded the general issue. The defendants, at the close of the evidence, moved the court to exclude the evidence and instruct the jury to find defendants not guilty, which motion the court overruled. The jury found for the plaintiff and assessed her damages at the sum of $5,000, and the court, after overruling defendants' motions for a new trial and in arrest of judgment, rendered judgment on the verdict. There was a former trial of the cause, in which the jury found appellants not guilty. On the last trial statements in writing were prepared, by the counsel for the parties, of what the witnesses for each party would testify, if called, and it was agreed that the witnesses, if called, would testify as stated. These statements, except certain parts which were stricken out by the court, together with the sections of a city ordinance set out in the declaration, comprised all the evidence. Following are the salient facts in evidence:

In September, 1903, Myers Brothers owned a lot on the northeast corner of Twelfth street and Fortieth avenue, in the city of Chicago, on which was a drug store fronting on Twelfth street. Twelfth street is an east and west, and Fortieth avenue a north and south

street. In said month of September the defendants, who were the receivers of the Union Traction Company, were permitted by Myers Brothers to erect a water closet for the use of their employes on the rear end of said lot and next to an alley which adjoined the lot at its north end. The door and two front windows of the closet, when it was constructed, faced the alley, the west side of the closet being next to Fortieth avenue. The closet was for the sole use of the defendants' employes, and was kept locked all the time, each of the employes having a key to it. It was a single room, standing alone, not in or attached to any building. The closet was constructed in the months of September and October, 1903. "The plumbing materials used in said building were put in by a regularly licensed plumber employed by the receivers. The plumbing and water closet appliances consisted of a sink, one urinal and one double stool, the double stool being so constructed that it connected with a single trap beneath it by one large pipe, the top thereof being oblong and of sufficient length to furnish space enough for two seats. The sink, urinal and double stool were all connected with a large trap which was located between them and the sewer, and so constructed that all the water and all substance of any and every kind that passed through either the urinal or sink or stools went through the trap into the sewer, and the trap was so constructed that when the bend of it was filled with water no sewer gas could get from the main sewer through the trap into either the sink, urinal or stools. The trap and pipes from the urinal, sink and stools passed through the floor of the building into a square box about five feet long, three and one-half feet wide and four feet deep, which was also enclosed by boards so constructed as to constitute a tight box, which came up flush with the floor and which was of sufficient strength and thickness and so constructed as to be frost proof. The trap was situated in this box, the

whole being so constructed that a plumber could get into the box for the purpose of cleaning the same or repairing the same, in case it needed repairing. Immediately over the box or basin in which the trap was located, and about the center thereof, there was a trap-door in the floor of the water closet that could be taken up so that egress and ingress was established to the basement. Said trap-door was so constructed that by reason of the dampness occasioned by the scrubbing of the floor it fitted tightly and could not be removed except by the use of screw-driver, chisel or other tool. The trap was connected with the main sewer at the southwest corner of the building. Said main sewer led from that point into Fortieth avenue, where it joined onto the main large sewer. The sewer was in a ditch dug about the time the building was constructed, and the ditch, having been recently dug, was filled with dirt which was looser than the dirt in its natural state, and this was especially so next to the sewer pipe. The course of the sewer pipe from the closet to the street could readily be observed by the settling of the earth in and along the ditch. The closet was a wooden building, about eight by nine and twelve feet, and was not in or attached to any other building. On the north side of said building and opening on to the alley was an ordinary sized door, and immediately west of the door were two windows, about five feet from the floor, each window being about twenty-eight inches wide and thirty-two inches high, which windows were on hinges and could be opened and fastened with a hook for the purpose of ventilation and when opened they furnished sufficient ventilation for said water closet." The sewer pipe ran from the closet to the main sewer in Fortieth avenue, adjacent to the main gas pipe of the People's Gas Light & Coke Company, and there connected with the main sewer. The water closet was not piped for gas, and there was no pipe connection between it and any gas

main or pipe. February 26, 1904, John L. Casey, a police officer of the city of Chicago, was found dead in the closet. The cause of his death is unknown. The day before Casey was so found several officers were on the premises and noticed that there were no openings in the roof or door of the closet, and could see nothing the matter with it, but detected a strong odor of gas—what gas, they did not know. On the finding of Casey's body as stated, the coroner impaneled a jury to hold an inquest, and directed Phillip Maher and other members of the police force of Chicago to go to the closet and examine it and ascertain if possible the cause of Officer Casey's death. Maher reported to his lieutenant, who also told him to go to the closet, and he went there, accompanied by Police Officers Dillon, Yore, Linke and other police officers. When they arrived at the closet the windows of it were open, and they lighted matches and put them down into the pipe leading from the stool to the trap, and did not discover gas of any kind in the said pipe, trap; or inside the building. On it being suggested by one of those present to get a tool and raise the trap door, Maher said, "No, we had better not do that, as it would be dangerous; let us wait until tomorrow, when we can have an inspector here," and thereupon they left the closet. The next day, February 27th, about twelve o'clock noon, Phillip Maher and Inspector Long went to the closet, and finding it locked borrowed a key from one of the defendants' employes, unlocked the door and went in. After they had been in the closet a short time, they went out and borrowed a screwdriver and chisel from a carpenter who was at work across the street from the closet, and again went in. Shortly thereafter an explosion occurred, the effect of which was to blow Maher and Long through the roof of the closet and cause injuries to them which resulted in Long's death within two days thereafter, and in Maher's death March 12, 1904.

The only person who witnessed the explosion was

the carpenter from whom the chisel and screw-driver were borrowed, who was about fifteen feet distant from the closet when the explosion occurred. Before the explosion and about 11:30 or 11:45 o'clock A. M., a janitor was in the closet, cleaning it, the windows being open. He left the closet, having closed the windows and locked the door, about five minutes before the time of the explosion, and while in the closet he detected no odor of gas. The closet was lighted and heated by electricity. The temperature from 8 o'clock A. M. till the time of the explosion, was from thirty-four to thirty-six degrees above zero. In the day time it was so dark inside the closet that when the trap door was raised, one could not see more than eighteen inches below the floor of the closet without an artificial light. Maher had no lamp or light when he entered the closet. The condition of the premises, as ascertained by examination shortly after the explosion, was as follows: The closet was pulled out of the soil pipe leading to the trap. The trap was in its proper place, and the walls of the closet were torn asunder and scattered about the yard and street.

JOHN A. ROSE and ALBERT M. CROSS, for appellants; W. W. GURLEY, of counsel.

THEODORE G. CASE, for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

Appellants' counsel contend that the court erred in admitting in evidence, over their objection, secs. 1456 and 1459 of an ordinance of the city of Chicago, set out in the declaration. The water closet in question was an exterior closet, consisting of a single room, not within or attached to any other building. The first part of sec. 1456 reads thus: "Water closets shall not be placed in an unventilated room or compartment. In every case the room or compartment must be open to the outer air, or be ventilated by means of an air

duct or shaft." This part of the section, if it stood alone, would be applicable to all water closets. But the remainder of the section relates solely to interior water closets. Section 1459, a subsequent section, relates exclusively to water closets "outside of buildings" and provides specifically that they "must be ventilated by means of slatted openings in the door and roof." The closet in question was a small wooden room and placed outside of and away from other buildings. The means of ventilation prescribed by sec. 1459 is quite different from that prescribed by sec. 1456, and the former section controls in respect to the water closet in question, and section 1456 is inapplicable to it. "Where there is in the same statute a particular enactment and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken only to affect such cases within its general language as are not within the provisions of the particular enactment." C. & N. W. Ry. Co. v. City of Chicago, 148 Ill. 159-60, citing Endlich on Int. of Stat., sec. 339. See, also, to the same effect, Dahnke v. The People, 168 Ill. 102, 111, and The People v. Kipley, 171 ib. 44, 84. It was error to admit in evidence sec. 1456. We find no error in the admission in evidence of sec. 1459. The court, by appellee's first instruction, submitted to the jury the question whether the appellants were guilty of negligence in violating secs. 1456 and 1459, "or either of said sections," and appellants contend that this was error, and such is our opinion. It is shown by the evidence, and not denied, that there were no slatted openings in the door or roof of the water closet. Also the evidence shows that there was no permanent opening of any kind in the closet for the admission of air from the outside. It is true that there were two windows in the closet on hinges, which windows might be hooked back, when they would be open for the ad-

mission of the air, but there is no evidence that they were or either of them was kept open constantly, and the evidence tends to prove the contrary. But counsel for appellants contend that the absence of slatted openings in the door and roof of the closet was not the proximate cause of the explosion, as charged in the second count of the declaration. Both Long and Maher having lost their lives by the explosion, there is no direct evidence of what occurred inside the closet after they entered it the second time and before the explosion, and we cannot concede, in view of the evidence, that the mere fact of the explosion is sufficient evidence that it was owing to the absence of slatted openings in the roof and door of the closet, and that the explosion would not have occurred had there been such openings. We think the evidence tends strongly to prove that the explosion was of illuminating gas, which had accumulated below the closet floor, of which the trap-door was a part, and not of accumulated gas of any kind above the floor of the closet. When Maher and other police officers examined the closet February 26th they found no gas of any kind in the closet or in the pipe leading from the stool to the trap, although they stuck down a lighted match in that pipe. They did not, on that day, raise the trap-door, because of Maher's suggestion that it would be dangerous to do so, and that they should wait till the next day, when an inspector would be there. This was said by him in answer to a suggestion by one of the persons present to get a tool and raise the trap-door. On the next day, February 27th, the date of the explosion, the janitor was in the closet cleaning it, which cleaning must have occupied some minutes at least, and, while engaged in cleaning the closet, he did not observe any odor of gas, and he left the closet "about five minutes before the time of the explosion." After the janitor left the closet Maher and Long borrowed a key from one of appellants' employes and opened the

door and entered the closet, after which they came out of the closet and borrowed a chisel and screw-driver from some carpenters who were working across the street from the closet, and again entered the closet with said tools. The evidence is that the trap-door of the closet was a part of the floor and "was so constructed that, by reason of the dampness occasioned by the scrubbing of the floor, it fitted so tightly that it could not be removed, except by the use of a screw-driver, chisel or other tool." On the previous day, on its having been suggested in Maher's presence to get a tool with which to open the trap-door, he said, "No, we had better not do that, as it would be dangerous; let us wait until tomorrow, when we can have an inspector here." It was so dark in the closet in the daytime that when the trap door was raised "a person could not see more than eighteen inches below the floor without an artificial light." There is evidence that Maher had not with him a lamp or other light, but none that he or Long had no matches, and the evidence shows that, in the investigation made after Officer Casey was found dead in the closet February 26, 1904, Maher was present, and in his presence lighted matches were put down in the soil pipe leading from the stool of the closet to the trap. The sole conceivable object of procuring the chisel and screw-driver by Maher and Long was to raise the trap-door. It is a legitimate inference that Maher and Long failed to discover, as did the janitor shortly before they entered the closet, any gas in the closet above the floor, as otherwise they would probably have refrained from raising the trap door. The evidence shows that the main sewer, with which the sewer pipe of the closet connected, was in Fortieth avenue, and the gas main pipe of the People's Gas Light & Coke Co. was also in that street, adjacent to the main sewer. On examination of the premises after the explosion, illuminating gas was found at the point where the sewer pipe entered the closet in

such quantity that it ignited when a lighted match was applied to it, and outside the closet, along the ditch in which the sewer pipe connecting the closet with the main sewer was laid, there were fissures in the ground from which illuminating gas was escaping, which ignited on the application to it of a lighted match; that the gas company opened up the gas mains and found a break in the gas main; that there was a break in it a foot long. The evidence of Claffy, a sanitary inspector, is that on the day of the accident he smelled gas at the closet, and that, in his opinion, the odor was that of illuminating gas. Also: "From my inspection there I have a theory of what caused the explosion. That theory is it was illuminating gas. I am familiar with sewer gas, as it is known to the trade. There is a distinctive odor from the sewer. It is not the gas odor you get from illuminating gas, nor that smell at all. It is an odor from stagnant water in which there is decomposing animal or vegetable matter, or both."

Appellee's counsel quotes an extract from the opinion in Fuchs v. St. Louis, 133 Mo. 179, 196, in which the court expressly recognizes the fact that such sewer gas as will explode is colorless and inodorous. The same counsel also contends that spontaneous combustion was the cause of the accident, and says that "plaintiff could prove that sewer gas, or illuminating gas, or both, would explode when confined." There is no evidence whatever that illuminating gas will explode spontaneously when confined, and no such proof is possible. If such spontaneous explosion could occur, the accumulation of large quantities of gas in reservoirs by gas companies, for distribution to consumers, would be attended with so great danger as to be impracticable. Millions of cubic feet are so accumulated and confined. It is a well-known fact that illuminating gas will not explode, unless it contains a certain percentage of air, and not then unless it comes in contact

with a spark or fire in some shape. Appellee's counsel, in another place in his argument, apparently recognizes this fact, saying: "This building was heated and lighted by electricity," etc. There is no evidence that the electric lights were exposed, or that they were not inclosed in hollow glass bulbs, in the usual way. That the lights were not strong or brilliant is evident from the fact that in the daytime, when the trap-door was raised, one could not see more than eighteen inches into the trap-box, which was about four feet deep. In view of the entire evidence, the jury, to say the least, would have been fully warranted in finding that the explosion was not owing to the absence of slatted openings in the door and roof. In view of the conclusion to which we have arrived in respect to the contention of appellant's counsel, which will be next considered, we do not find it necessary to pass on the question whether the verdict is manifestly contrary to the weight of the evidence. Counsel for appellants contend that Maher, deceased, did not enter the closet by invitation of the appellants, express or implied, and that there being no evidence that appellants wilfully or wantonly injured him, there can be no recovery. There is no evidence of express invitation, and appellee's counsel does not claim that there is, but claims that there was an implied invitation. The ground of this claim is that one of defendants' employes loaned to Maher and Long, at their request, a key to the closet, using which, they entered the closet. The closet, as the evidence shows, was provided by appellants for the sole use of their employes, and a key was given to each of the employes for his personal use. There is no evidence that any employe had authority to lend his key to anyone not an employe of appellants, or that the appellants, or either of them, knew of the lending of the key to Maher and Long, and under these circumstances an invitation by appellants cannot, as we think, be implied from the lending of the key.

Appellee's counsel contends, correctly, as we think, that Maher, as a police officer, was lawfully on the premises, and had lawful right to enter the closet with Long, the inspector, for the purpose of investigating its condition. This being true, and the closet not being a residence, they might legally have broken open the closet door, if necessary to secure entrance, as was done by the fire patrol in Gibson v. Leonard, 143 Ill. 182, hereinafter referred to. Appellee's counsel contends that Maher, having had lawful authority to enter the closet, an invitation or license to enter may be fairly implied, and in support of this contention cites 1 Thompson's Com. on Law of Negligence, sec. 981. The author cites, in support of the text, several Massachusetts and one Minnesota decision. There is no doubt that the decisions of courts of some foreign jurisdictions support the text; but the author, in the same volume, sec. 980, cites Gibson v. Leonard, 143 Ill. 182, and Beehler v. Daniels, 19 R. I. 49, as holding the contrary. We do not regard the question an open one in this state, since the decision in Gibson v. Leonard, 143 Ill. 182. Gibson was a member of a fire insurance patrol. The patrol forced open the door of the main floor of a building, for the purpose of extinguishing a fire which had broken out in the upper stories of the building. The patrol had statutory authority to enter any building on fire. While Gibson, the plaintiff, was descending from the main floor to the basement of the building, by means of an elevator or hoistway, the rope which held the counter-weight of the elevator broke about fifteen inches above the counter-weight, and the counter-weight fell on one of Gibson's legs and so injured it that it had to be amputated. It was charged as negligence that the counter-weight was unguarded and in a dangerous condition, and that the rope to which it was attached was old, rotten and of insufficient size and strength. The verdict and judgment were for the defendant in the trial court, and the

judgment was affirmed in this and in the Supreme Court. The court held that the plaintiff was lawfully on the premises, by permission of the law, but not by invitation of the owner of the premises; that he was a mere naked licensee, and that the owner owed him no duty, except to refrain from wilful or affirmative acts injurious to him. In the course of the opinion the court say: "Appellant was not invited or induced by appellee to go into the building, but he was lawfully there. Both the common law and the statute gave him the right to go there. He being there lawfully, is there any evidence tending to show that appellee invited him to make use of the elevator or hoist? If appellee had done anything to induce him to come into the building, then it might possibly be said that he had a right to rely on the appellee's keeping the premises, including the elevator, in a safe condition while he was there. But here there was not even a license from appellee— the only license was from the law; and so he had no right to conclude that there was an assurance from appellee that either the premises or the elevator was safe." The following cases are to the same effect: Beehler v. Daniels, 18 R. I. 563; Same v. Same, 19 ib. 49; Eckes v. Stetler, N. Y. Supreme Ct., 90 N. Y. Supplement, 473; Hamilton v. Minneapolis Desk Mfg. Co., 78 Minn. 1; Faris v. Hoberg, 134 Ind. 269; Woodruff v. Bowen, 136 ib. 431; New Omaha T-H. Elec. Light Co. v. Anderson (Sup. Ct. Neb. 1905), 102 N. W. Rep. 89.

Other objections are made by appellants' counsel, which we deem it unnecessary to pass on. The judgment will be reversed.

*Reversed.*